ZENITH RADIO CORP.

v.

RADIO CORP. OF AMERICA et al.

Civ. No. 1247.

United States District Court,
D. Delaware.

May 20, 1954.

See also D.C., 121 F.Supp. 792.

Arthur G. Connolly and Thomas Cooch of Connolly, Cooch & Bove, Wilmington, Del., Joseph S. Wright, Francis W. Crotty and Philip J. Curtis, Chicago, Ill., Willis H. Taylor, Jr., R. Morton Adams and Thomas F. Reddy, Jr., of Pennie, Edmonds, Morton, Barrows & Taylor, New York City, and Thomas C. McConnell of McConnell, Lutkin & Van Hook, Chicago, Ill., for plaintiff.

Caleb S. Layton of Richards, Layton & Finger, of Wilmington, Del., Stephen H. Philbin of Fish, Richardson & Neave, New York City, John W. Nields of Cahill, Gordon, Zachry & Reindel, New York City, and Leonard Lyon, Los Angeles, Cal., for defendant Radio Corporation of America.

John J. Morris, Jr., of Morris, James, Hitchens, & Williams, Wilmington, Del.,

Thomas Thacher and Delevan Smith of Simpson, Thacher & Bartlett, New York City, for defendant General Electric Co.

William Prickett, Wilmington, Del., and John E. F. Wood and Henry R. Ashton, New York City, for defendant Western Electric Co., Inc.

LEAHY, Chief Judge.

Under 28 U.S.C. § 2201, Zenith sought declaratory judgment of invalidity, noninfringement and unenforceability of certain patents against six defendants.[1,2] Injunctive relief was also asked. Service was obtained on RCA, GE and WE. Other defendants refused to appear and are not before the court. Each of the parties served counterclaimed, alleging Zenith infringed particular patents. Zenith's reply denied both validity and infringement of the patents, and again asserted their unenforceability. A separate trial of the validity and infringement issues was ordered January 30, 1953, to precede trial of the issues of enforceability.

On November 4, 1953, Zenith moved to dismiss the counterclaim for defect of parties, urging the indispensability of the absent parties because they held rights in the counterclaimed patents tantamount to co-ownership. Concomitant with pre-trial hearings, the motion was briefed and argued on January 21, 1954.

The counterclaims—patents were withdrawn and others substituted in the counterclaim—enumerate the patents Zenith supposedly infringes by its manufacture and sale of AM, FM and television home receivers. Zenith does not dispute record ownership of all counterclaimed patents in the three parties defendant before the court[3] but launches other offensives against them. In its instant attack, Zenith undermines the counterclaim by arguing the absent AT & T and Westinghouse[4] are indispensable parties to adjudication of validity of patents therein cited. The development of this position has a certain surface appeal, as it unfolds citing Shields v. Barrow[5] classic definition of indispensable parties; bridging to the patent field over the Shell[6] case's reference to Shields v. Barrow in an R.S. § 4915 * suit involving sublicensing rights; excluding the infringement issue from all relevance to the domination of patent validity; selectively emphasizing as crucial the grant of sublicensing rights by quoting from the Special Equipment case,[7] this court's Preload case[8] and others; specifying additional controls said to be carved from the patents by the absent defendants under certain agreements;[9] and concluding AT & T and Westinghouse have a working co-ownership of counterclaim patents with an indispensable role to play, under cited

1. Radio Corporation of America (RCA), General Electric Co. (GE), Western Electric Co., Inc. (WE), American Telephone and Telegraph Co. (AT & T), Bell Telephone Laboratories, Inc. (Bell), and Westinghouse Electric Corporation (Westinghouse).

2. For past history of this litigation, see Zenith Radio Corp. v. Radio Corp. of America, D.C.Del., 78 F.Supp. 591; Id., D.C.Del., 106 F.Supp. 561; Id., D.C. Del., 109 F.Supp. 913.

3. Pars. 2, 6, 10, Reply to Counterclaim.

4. Bell is not urged as an indispensable party. Record, Jan. 21, 1954, p. 7.

5. 1854, 17 How. 129, 139, 58 U.S. 129, 139, 15 L.Ed. 158.

6. Shell Development Co. v. Universal Oil Products Co., D.C.Del., 61 F.Supp. 925; 63 F.Supp. 476, on rehearing, affirmed 3 Cir., 157 F.2d 421.

* Now 35 U.S.C.A. §§ 145, 146.

7. Special Equipment Co. v. Coe, 324 U.S. 370, 378, 65 S.Ct. 741, 89 L.Ed. 1006.

8. Preload Enterprises, Inc. v. Pacific Bridge, D.C.Del., 86 F.Supp. 976, 980.

9. Plaintiff's Reply Brief, pp. 12–15. The named parties defendant operate in various "fields" of business under a series of agreements. These and their principal modifications have been added to the record on this issue. For identification purposes only, I shall refer to them as "cross-licensing agreements".

joint ownership cases, before the counterclaim can be staged.[10]

Regard for long-standing elementals of patent properties and their application to the basic clauses of the cross-licensing agreements, coupled with realignment of several misconceptions, punctures Zenith's argument. This is so even while *assuming arguendo* these main propositions of plaintiff;

1. "each party to the agreements (including AT & T and Westinghouse) *shares with the nominal owner* and independently exercises *in its 'fields'* the vital right to grant or withhold licenses and the concomitant right to collect and retain royalties under such licenses as well as to control and share in recoveries in infringement litigation and to grant releases for past infringement with respect to all of the patents in the pool" [11] (italicized words to receive attention infra); 2. validity of the patents is the paramount background issue; 3. R.S. § 4915 cases are not "in rem" actions or per se distinguishable.

▆▆ Two constituent property elements, of distinct source, nature, and divisible content inhere every patented invention.[12] One is the property in the invention itself—the right to make, use and sell the patented object personally or through others—the second is property in the monopoly—the right effectively to prohibit others from practicing the invention or profiting therefrom without owner's consent. Means of transferring these two property rights have pertinence here and vary greatly. Rights in the invention itself may be transferred either separately or together, upon one person or many, and each may independently of the others use the rights re-

ceived. The monopoly is indivisible, except as to locality, although several assignees may jointly hold the undivided interest in the patent. Gayler v. Wilder, 10 How. 477, 51 U.S. 477, 13 L.Ed. 504. Chief Justice Taney stated the principle at page 493 of 10 How.: a "patentee may assign his whole interest, or an undivided part of it. But if he assigns a part under this section, it must be an undivided portion of his entire interest under the patent, *placing the assignee upon an equal footing with himself for the part assigned.* Upon such an assignment, the patentee and his assignees become joint owners of the whole interest secured by the patent, according to the respective proportions which the assignment creates." (Emphasis added.) Then, referring to patentee's assignment of "his exclusive right" within specified territorial limits, it was said at pages 493–494 of 10 How.: "But in order to enable him to sue, the assignment must undoubtedly convey to him the entire and unqualified monopoly which the patentee held in the territory specified,—excluding the patentee himself, as well as others. And any assignment short of this is a mere license.— Unquestionably, a contract for the purchase of any portion of the patent right may be good as between the parties, as a license, and enforced as such in the courts of justice. But the legal right in the monopoly remains in the patentee, and he alone can maintain an action against a third party who commits an infringement upon it." On the facts before it, that Court regarded as a license only, "not an assignment of an undivided interest in the whole patent, nor the assignment of an exclusive right" in a locality, a purported exclusive right in

---

10. This skeletonized version of the argument presented has enhanced appeal in its full form.

11. Plaintiff's Brief, page 7: "Nature of the Rights Conveyed by the Agreements". In clarification of this assumption, I make four observations upon this language from Zenith's brief: 1. I take the italicized words as applying to all that follow them; 2. "independently" I inter-

pret as not excluding patentees' exercise of the same rights; 3. I do not read "control" as meaning "absolute control" but rather as referable to the mechanics in the agreements of suing infringers; 4. "all of the patents in the pool" can only be allowed to include those patents listed in the counterclaim since they alone are here in point.

12. 2 Robinson On Patents 508–510 ff.

the alienee since this right was bounded by a very limited reservation in the alienor.[13]

■ Modes of transferring property rights in patents vary greatly in legal effect and are of some moment in answering Zenith's argument. Judge Rodney in Preload Enterprises, Inc. v. Pacific Bridge Co., D.C.Del., 86 F.Supp. 976, has fully treated their variations and legal significance. Reference, rather than repetition, is made to that opinion. In supplement of it, I add the reason behind the distinctions: "When the patentee conveys the exclusive right to make, use, and sell the invention he has no longer any occasion for the exercise of the prohibitory powers created by the patent, while they become essential to his alienee for the assertion and vindication of their exclusive rights. If he transfers an undivided portion of the entire interest in the invention, he thereby confers upon his transferees rights equal to his own, in all respects, in the invention, and receives them into co-ownership with himself in the monopoly which is now as essential to their protection as it was to his." 2 Robinson On Patents 514. Zenith to succeed in its argument must show transfer of "an undivided portion of the entire interest in the invention" to the absent parties. They must be "upon an equal footing with the patentees" (RCA, GE, WE) "in all respects" for the "undi-

vided part assigned" in the counterclaim patents.[14] If the agreements leave in the patentees any distinct rights in the area of their grant not exercisable by grantees, they confer only licenses and pass no property in the monopoly. Cf. Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923. If licensees, AT & T and Westinghouse are not indispensable parties Zenith admits.[15]

The text of the cross-licensing agreements conveys "non-exclusive licenses" and the right to grant "non-exclusive" sub-licenses. Zenith does not deny the presence of these terms in the agreements but accords them no meaning: 1. "license" is peremptorily and permanently discarded as a self-serving, erroneous label for the grant—instead of postponing classification of the conveyance until its own bounds categorize it; 2. "non-exclusive" is interpreted as "exclusive"[16] although that technical adjective in every significant sense precedes "license" throughout its appearance in the agreements and "exclusive" is found nowhere in them. On these premises rests Zenith's slanted syllogism with its conclusion of patent co-ownership. In their correction lies the answer to the argument.

■ The term "non-exclusive" must be given effect. Zenith presents no valid reason to counteract its normal meaning. It is a key description of the extent of the patentee's conveyance, be it

13. At this early stage, Zenith's premise becomes shaky since the alienors of the patents in suit reserved from AT & T and Westinghouse greatly more than did Wilder from Herring.

14. In deciding this motion, we are only concerned with the extent of the rights RCA, GE and WE gave to AT & T and/or Westinghouse in the patents listed in the counterclaim. Plaintiff entertains a basic misconception of this scope and argues points properly belonging to the unenforceability or anti-trust issues, extending to all the interrelationships and all the patents of all the defendants. E. g. Plaintiff's Brief, pp. 2–5.

15. Plaintiff's Reply Brief, p. 15.

16. As in another instance, this stems from coalescing the defect of parties issue and the unenforceability and anti-trust arguments, which will not become pertinent until after trial of validity and infringement. This I gather in part from Zenith's assertion in its Reply to Counterclaims (p. 12) that AT & T, Westinghouse, GE, WE, and Bell "although having the right to grant licenses to manufacturers of radio and phonograph apparatus, have adopted and practiced a policy of not granting such licenses" or otherwise funneling the business to RCA. From this policy comes the conclusion of the exclusiveness of the grant. However, a patentee's self denial of enjoyment of his record rights does not in itself invalidate them or enlarge those he conveys.

applied to a vital right such as sub-licensing or a lesser, fringe benefit under a patent. It spells the difference between the patentee's abandoning the field, or any part of it, in favor of his alienee or retaining the paramount rights in his monopoly to which his patent entitles him. To my mind, it can not be a door through which one can enter into co-ownership. A true non-exclusive conveyance is inconsistent with co-ownership status in patents. Although in a general, non-technical sense non-exclusive rights may be considered a "sharing" in the patent's benefits [17]—as may the merest interest—that is not the sharing "upon an equal footing" "in all respects" which constitutes an "undivided part assigned" or co-ownership of the patent monopoly. If it were, any bare license would qualify for co-ownership and establish the licensee as an indispensable party to every action involving validity. A non-exclusive grant, in fact, demonstrates the opposite: by it patentee expressly negates the exclusion of both himself and all others to whom he may later choose to grant rights of the same, or even greater, calibre. Having conveyed only non-exclusive rights, patentee retains all others and through them continues his dominion over the monopoly.

Claim of the absent defendants' co-ownership of the counterclaim patents is finally proved bogus in the face of the admitted fact [18] the agreements further restrict the "non-exclusive" rights conveyed to particular "fields" of activity. AT & T and Westinghouse hold only non-exclusive rights limited to certain purposes or fields which do not in terms embrace the field in which Zenith's alleged infringement falls. RCA, GE and WE do not charge Zenith with infringement of the patents in the areas or fields in which AT & T and Westinghouse have been granted their non-exclusive rights in them. Cf. P. R. Mallory & Co. v. Automotive Mfrs.' Outlet, D.C.S.D. N.Y., 45 F.2d 810, 813. By the non-exclusiveness of the grant, then, the patentees retained the right to enjoy the invention at least as fully as—I think more fully than—their grantees. By further limiting the grant to "fields", the patentees also retained all the rights in all other fields and for all other purposes. In these excepted "fields", AT & T and Westinghouse could neither make, use, or vend, nor grant or withhold licenses, nor collect and retain royalties, nor control and share in recoveries in infringement litigation, nor grant releases for past infringement.[19]

On the other hand, RCA, GE, and WE, the patentees, do hold the absolute power to cultivate in all the "fields" all these benefits of their respective patents as they choose. Zenith complains the patentees in fact do not so utilize their patent rights and in practice scrupulously avoid invasion of the other's allotted fields. This has no significance to the defect of parties issue. We are here concerned only with the formal or paper rights conveyed and retained by the patentees under the language of the cross-licensing agreements—not with the patentees' use or abuse of their rights under some other agreement or conspiracy. Nor is the interplay among the five defendants of present relevance—each alternatively appearing as patentee-grantor of some rights and as grantee-recipient of rights in other patents, one with another. We are at this stage concerned only with particular patents, not with all of defendants' patent policies, systems, or their entire accumulation of patents. For present purposes, it is sufficient to realize only that, should defendants be restraining themselves from enjoyment of their record rights in certain fields,

17. Zenith's only apparent concession to the presence of "non-exclusive" is in this general sense of utilizing the patents. Plaintiff's Brief, p. 7, quoted supra.

18. Plaintiff's Brief, page 7, quoted supra.

19. This is a concession explicit in Zenith's own statement of the nature of the rights conveyed by the agreements, previously quoted. However, even had that concession not been made, the same result would follow because the cross-licensing agreements in undeniable terms do convey only "non-exclusive" rights in certain "fields".

this does not annul those rights or widen the scope of rights previously conveyed. Non-use of patents does not render them invalid. Special Equipment Co. v. Coe, 324 U.S. 370, 65 S.Ct. 741, 89 L.Ed. 1006. Certainly, partial non-use cannot do more.

Comparison of the rights assumed to be held by the absent defendants with those retained by the party defendants convinces me technical co-ownership of the counterclaim patents does not exist among the five companies. The cross-licensing agreements do leave in the record patentees distinct rights in the same area in which others have been given rights, not exercisable by these others. Under the authorities, the agreements pass no property in the monopoly. I find no sharing of the patent monopoly by RCA, GE or WE with AT & T or Westinghouse, nor any necessity in principle for their requiring such share. Equality of ownership of the counterclaim patents not having been established, the rights conveyed to AT & T and Westinghouse fall into the catch-all category of licenses. As non-exclusive licensees, the missing defendants are not indispensable parties.

Motion to dismiss the counterclaim is denied.